

STATE OF NORTH CAROLINA
COUNTY OF ROWAN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

Gary Hess Studios,
Plaintiff,

v.

JG Motorsports, Inc.
Hendrick Motorsports, LLC, and
Jeff Gordon, Inc.,
Defendants.

**COMPLAINT**
(Jury Trial Demanded)

---

Plaintiff Gary Hess Studios, for its Complaint against defendants JG Motorsports, Inc. ("JGM"), Hendrick Motorsports, LLC ("HMS"), and Jeff Gordon, Inc. ("JGI," and collectively with JGM and HMS, the "Defendants"), does hereby allege and say:

## INTRODUCTION

This is an action to redress the injuries Plaintiff suffered when Defendants unjustly profited by purporting to license helmet designs owned by Plaintiff without Plaintiff's knowledge or consent. Although Plaintiff was delayed in bringing this action, Defendants' own immoral conduct induced the delay, and as such Defendants are estopped from asserting certain time-based defenses that may otherwise apply to Plaintiff's claims.

## PARTIES

1. Plaintiff is a small business owned and operated by Jonathan Gary Hess with a principal place of business at 107 N. Main St, Faith, North Carolina 28041. During the times relevant to this action, Plaintiff was engaged in the business of designing and painting custom

racing helmets. Plaintiff designed and painted several racing helmets worn by Jeff Gordon during the years of 1999–2006.

2. Defendant JGM is a North Carolina corporation with its offices and principal place of business located in Charlotte, North Carolina. JGM was a NASCAR motorsports team that featured Jeff Gordon, a highly successful NASCAR driver. JGM was one of the entities responsible for licensing intellectual property associated with Jeff Gordon.

3. Defendant HMS is a North Carolina corporation with its offices and principal place of business located in Charlotte, North Carolina. HMS is a NASCAR motorsports team that featured Jeff Gordon after JGM merged into HMS in 2001. HMS was one of the entities responsible for licensing intellectual property associated with Jeff Gordon.

4. Defendant JGI is a North Carolina corporation with its offices and principal place of business located in Charlotte, NC. JGI was one of the entities responsible for handling business matters associated with Jeff Gordon.

## JURISDICTION AND VENUE

5. This court is vested with jurisdiction over the Defendants because, at all times material hereto, they were corporations incorporated and maintaining places of business in the State of North Carolina.

6. Venue is proper in Rowan County under N.C. Gen. Stat. §1-79 and 1-82.

## FACTUAL ALLEGATIONS

7. Plaintiff began designing and painting custom racing helmets in 1997. Plaintiff had previous experience designing NASCAR paraphernalia, and because of the high quality of Plaintiff's work, Plaintiff quickly established itself as one of the leading design studios in the field.

8. In 1998, Plaintiff, then operating under the name G-Force Designs, was approached by John Bickford Jr., Jeff Gordon's stepbrother. John Bickford Jr. asked Plaintiff to provide samples of custom helmet designs that he could show to Jeff Gordon. Plaintiff created three different helmet designs for Jeff Gordon to preview.

9. In 1999, Plaintiff was informed that Jeff Gordon had selected one of Plaintiff's custom helmet designs to wear during his NASCAR races. Plaintiff painted a helmet featuring the chosen design and delivered it to Jeff Gordon's team.

10. From 1999 until 2006, Plaintiff designed and painted numerous helmets for Jeff Gordon to wear during races. Collectively, along with the first helmet design, these custom helmet designs shall be referred to as the "Helmet Designs." The Helmet Designs are displayed in Exhibit A. Plaintiff remained the sole owner of the rights to the Helmet Designs at all times. While Jeff Gordon had the right to wear the custom racing helmets during his races, Plaintiff never gave any party permission to otherwise use or replicate the Helmet Designs.

11. Plaintiff's Helmet Designs received acclaim from both Jeff Gordon and the NASCAR community at large. When Jeff Gordon selected a new paint scheme for his racecar in 2001, he chose a paint scheme inspired by one of Plaintiff's Helmet Designs.

12. Although Plaintiff never gave permission to any party to replicate the Helmet Designs, these designs were nonetheless the subject of massive and widespread copyright infringement by various manufacturers. Examples of infringing products are attached as Exhibit B.

13. The Helmet Designs were replicated and reproduced by numerous manufacturers of NASCAR memorabilia. Collectively, these infringing manufacturers shall be referred to as

"Third-Party Manufacturers." Plaintiff does not currently allege that Defendants themselves produced any infringing products.

14. One of the largest Third-Party Manufacturers of Plaintiff's Helmet Designs was Action Performance Co., Inc. (APC). APC was founded in the early 1990s and held "exclusive" licenses with various NASCAR teams and drivers to produce various products, such as die-cast, helmets, trinkets and apparel. A variety of brand names were established and used with Action Racing Collectables (ARC) being the most popular.

15. In late 2005, Plaintiff was informed that Defendant HMS had created a new department that oversaw Defendant HMS's acquisition of drivers' helmets, uniforms, gloves, and shoes. Plaintiff met with the two members of this department, Michelle Emser and Todd Rucker. They were surprised to hear that Plaintiff was not being paid for the work he was performing. They told Plaintiff that he would be paid going forward, and Plaintiff was paid approximately $500.00 for each helmet he painted for Jeff Gordon after this meeting.

16. However, although Plaintiff was reimbursed for painting helmets after this date, Plaintiff was only paid for labor and costs associated with painting those helmets. Plaintiff always retained ownership of the rights to the Helmet Designs, including those created after the aforementioned meeting.

17. On information and belief, Defendants were all substantially involved with licensing Jeff Gordon's various intellectual properties, including trademarks and copyrights related to Jeff Gordon that the Defendants owned. Defendants would license intellectual property such as Jeff Gordon's name, his NASCAR number, his signature, and his appearance.

18. Defendants have maintained that they never licensed or purported to license any of Plaintiff's Helmet Designs to any party. Of course, because Defendants did not own the Helmet

Designs, they did not have the ability to properly license the rights to the Helmet Designs to any Third-Party Manufacturer.

19. Throughout the period during which Plaintiff provided custom helmet painting services to Defendants, Plaintiff would occasionally raise concerns regarding infringing products and inquire about fees, royalties, or profits that were owed to him. Defendants consistently denied that Plaintiff was owed anything by Defendants or that Defendants were doing anything improper. Plaintiff believed relied on these representations.

20. One such denial occurred in May 2000, when Plaintiff visited Defendants' offices. Plaintiff met with Scott Hammond, an officer of Defendant JGM, and was introduced to Jeff Gordon personally. After this meeting, Hammond and Plaintiff spoke outside, and as part of that conversation, Plaintiff asked whether Defendant JGM owed him anything. In response, Hammond laughed, as though it were absurd for Plaintiff to believe that he was entitled to any compensation. Plaintiff relied on this representation and did not pursue further. Similar misrepresentations were made throughout the relevant time period.

21. These denials and representations continued to present day. On March 21, 2018, Michael Holland, an officer of Defendant JGM, wrote as follows: "[N]o entity acting on behalf of Jeff Gordon licensed any marks that were not owned and/or controlled by that licensing entity . . . . [A]ny marks not licensed by JGM were acquired (or should have been acquired) licensee."

22. However, upon information and belief, several Third-Party Manufacturers believed that they had properly licensed the Helmet Designs from Defendants.

23. Upon information and belief, Defendants profited from purporting to license Plaintiff's Helmet Designs and misleading Third-Party Manufacturers into believing that they had properly licensed the infringing products that they were producing.

24. Plaintiff admits he was aware of that several Third-Party Manufacturers were producing infringing copies of Plaintiff's Helmet Designs. For various reasons, including a reasonable fear that he would be blackballed by not only Defendants but by the entire NASCAR industry should he complain, Plaintiff failed to timely pursue potential claims against these Third-Party Manufacturers.

25. However, Plaintiff was not aware that Defendants were profiting by purporting to license the Helmet Designs. Defendants made false representations and concealed material facts with the intention that Plaintiff rely on their dishonest conduct. Defendants had actual or constructive knowledge of the real facts. Plaintiff had no knowledge of these facts nor the means to learn the facts. Plaintiff relied upon the conduct and misrepresentation of the Defendants. As such, Defendants are equitably estopped from asserting time-based affirmative defenses such as the statute of limitations. *Friedland v. Gales*, 509 S.E.2d 793, 797 (N.C. App. 1998).

26. Defendants have continued to conceal their misdeeds. Within the past few months, an officer of JGM approached at least one former employee of APC to request that the employee not speak with Plaintiff about this matter. On information and belief, Defendants have taken additional efforts to prevent Plaintiff from discovering the nature of Defendants' wrongdoings. Were Defendants being truthful, there would be no need to fear Plaintiff speaking with Third-Party Manufacturers.

27. On May 5, 2006, Defendants delivered to Plaintiff a letter terminating Plaintiff's services. The letter claimed that Defendants JGM and JGI were terminating Plaintiff's services because Plaintiff's quality of work had decreased and because Plaintiff was not timely in delivering the painted helmets.

28. Plaintiff asserts that there had been no change in the quality or timeliness of his work. Rather, on information and belief, Plaintiff's services were terminated as part of an effort to conceal the bad acts of Defendants and to prevent Plaintiff from bringing claims against Third-Party Manufacturers.

29. The message sent to Plaintiff was clear: Efforts to inquire or investigate further about Third-Party Manufacturers and the infringing products they were producing would be met with retaliation. Plaintiff did not pursue litigation against the Third-Party Manufacturers largely because of that fear of retaliation.

30. On January 22nd, 2018, Plaintiff, who now provides tattooing services, tattooed a former employee of APC. This employee, who had knowledge of APC's licensing practices, was surprised to hear that Plaintiff had never been paid by Defendants for his Helmet Designs and explained to Plaintiff that Defendants likely profited unfairly at Plaintiff's expense. It was at this point Plaintiff first had knowledge of the wrongdoings committed by Defendants.

**FIRST CAUSE OF ACTION:**
**UNJUST ENRICHMENT**

31. Plaintiff realleges and incorporates by reference Paragraphs 1 through 30 of this Complaint as if fully set forth herein.

32. Defendants were unjustly enriched by purporting to license the Helmet Designs to Third-Party Manufacturers.

33. Plaintiff is entitled to money damages from Defendants on account of Defendants' unjust enrichment through its unscrupulous practices in fraudulently purporting to license the Helmet Designs in an amount to be proven at trial.

## SECOND CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

34. Plaintiff realleges and incorporates by reference Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

35. Defendants knew, or should have known, that Plaintiff was the sole owner of the Helmet Designs.

36. Defendants knew, or should have known, that Third-Party Manufacturers would seek to license the Helmet Designs from Plaintiff.

37. Defendants knowingly, willfully, maliciously, and/or recklessly made misrepresentations regarding ownership of the Helmet Designs.

38. In making these aforementioned misrepresentations, Defendants knew, or should have known, that because of these misrepresentations, Third-Party Manufacturers would be misled into believing that Defendants had the authority to license the Helmet Designs.

39. Because Third-Party Manufacturers believed that they had properly licensed the Helmet Designs, they did not approach Plaintiff to properly license the Helmet Designs.

40. By the foregoing actions, Defendants acted without justification, and not in the legitimate exercise of its own rights, but in the intentional, willful, malicious, and/or reckless disregard of Plaintiff's rights, in making the aforementioned misrepresentations.

41. Defendants' actions resulted in actual damage to Plaintiff in that had Defendants not made the aforementioned misrepresentations, Plaintiff would have entered into and profited from licensing agreements made with Third-Party Manufacturers.

42. Plaintiff is entitled to money damages from Defendants on account of Defendants' tortious interference with Plaintiff's prospective economic advantage in an amount to be proven at trial.

**THIRD CAUSE OF ACTION:**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**

43. Plaintiff realleges and incorporates by reference Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44. The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") provides that "[u]nfair methods of competition in or affective commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful." N.C. Gen. Stat. §57-1.1(a).

45. By misleading Third-Party Manufacturers to believe that they had properly licensed the Helmet Designs, when in fact no such permission was properly granted, Defendants allowed the NASCAR memorabilia market to be flooded by illegal bootleg copies of Plaintiff's Helmet Designs. On information and belief, because of Defendant's actions, thousands of North Carolina consumers were sold these illegal bootleg reproductions.

46. Defendants' practices set forth herein violate North Carolina law as illegal, unfair or deceptive acts or practices in the conduct of any trade or commerce because they are inherently deceptive.

47. As a direct and proximate result of Defendants' unfair trade practices, Plaintiff suffered damages.

48. By reason of the foregoing, Plaintiff has been actually damaged in an amount to be proven at trial. In addition, the damages to the Plaintiff should be trebled and Plaintiff should be allowed to recover costs and attorneys' fees.

## FOURTH CAUSE OF ACTION:
## FRAUD

49.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50.     In order to retain the profits generated by Plaintiff's Helmet Designs, Defendants made numerous false representations and intentional omissions of material fact to Plaintiff, as previously alleged. These false representations and intentional omissions were intended to conceal Defendants' misdeeds from Plaintiff and to prevent Plaintiff from recovering what Plaintiff was due.

51.     On information and belief, Defendants also made numerous false representations and intentional omissions of material fact to Third-Party Manufacturers in order to conceal Plaintiff as the true owner of the Helmet Designs.

52.     Defendants knew or should have known, at the times it purposefully omitted to state material facts and knowingly made affirmative misrepresentations as previously alleged, that such fraudulent misrepresentations and omissions were material and false, but nonetheless made them with the intention that Plaintiff would rely upon them.

53.     But for Defendants' intentional misrepresentations and material omissions of fact described above, Plaintiff would have profited from licensing his Helmet Designs to Third-Party Manufacturers.

54.     As a result of Defendants' intentional, willful, and wanton and malicious conduct, Plaintiff has suffered damages in an amount to be proven at trial and should be awarded such punitive and other damages as fully as the court might allow.

**FIFTH CAUSE OF ACTION:**
**FRAUDULENT CONCEALMENT**

55. Plaintiff realleges and incorporates by reference Paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56. As described above, due to the nature of the relationship between Plaintiff and Defendants, and particularly because of Plaintiff's vulnerable position in that relationship, a relationship of trust and confidence existed between Plaintiff and Defendants such that Defendants had a duty to disclose the fact that they were purporting to license the Helmet Designs to Third-Party Manufacturers.

57. Defendants failed to disclose this fact, and instead took steps to conceal this fact.

58. Plaintiff was in fact deceived.

59. Fraudulent concealment tolls the statute of limitations when the elements are shown. *Friedland v. Gales*, 131 S.E.2d 793, 797 (N.C. App. 1998).

60. Plaintiff was damaged as a result of Defendants' concealment in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION:**
**CONSTRUCTIVE FRAUD**

61. Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. As described above, due to the nature of the relationship between Plaintiff and Defendants, and particularly because of Plaintiff's vulnerable position in that relationship, a relationship of trust and confidence existed between Plaintiff and Defendants.

63. Defendants used their position of trust and confidence to deceive Plaintiff and to profit at Plaintiff's expense.

64. Plaintiff reasonably relied on Defendant's representations.

65. Plaintiff was in fact deceived.

66. Plaintiff has suffered damages as a direct and proximate result of Plaintiff's breaches of their fiduciary duty in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gary Hess Studios respectfully prays the Court as follows:

(1) For a trial by jury;

(2) That Plaintiff recovers against Defendants, jointly and severally, an amount in excess of $10,000, said amount to be proven at the trial of this action;

(3) That Plaintiff recovers against Defendants, jointly and severally, treble damages and attorneys' fees for their unfair and deceptive trade practices as provided in N.C.G.S. §§75-16 and 17-16.1;

(4) That punitive damages be assessed against Defendants;

(5) That Plaintiff be awarded pre-judgment and post-judgment interest;

(6) That the cost of this action be taxed against Defendants, jointly and severally;

(7) That the court award such other and further relief as it deems necessary and equitable in the circumstances.

This, the 14th day of June 2018.

______________________________

Andrew McClain Adams
N.C. State Bar No. 50548
Attorney for Plaintiff
450 Design Ave.
Winston-Salem, NC 27106
andrew@andrewadamslaw.com
(704) 654-0254

**Exhibit A**

2000 PEPSI



2000 DUPONT "FEATHER AND FLAMES"
VERY FIRST ONE PAINTED.
JEFF WEARING ON FRONT
OF 2000 CALENDAR.
DUPONT
Arai
DUPONT
AUTOMOTIVE
FINISHES
PEPSI
QUAKER STATE
GORDON
Arai
DUPONT
AUTOMOTIVE
FINISHES
PEPSI
QUAKER STATE



2001 DUPONT
W/AUTOMOTIVE FINISHES LOGO
OVERLAPPING FLAMES IS NEW



**2001 DUPONT**
**W/DUPONT MOTORSPORTS LOGO**
**LOGO CHANGED MID SEASON**





2002 DUPONT
DUPONT
DUPONT
PEPSI
Fritos

DUPONT
MOTORSPORTS

2002 PEPSI
PEPSI
Fritos





2003 DUPONT
DUPONT
MOTORSPORTS
DUPONT
DUPONT
MOTORSPORTS
DUPONT



## 2004 DUPONT "PROTOTYPE"





## 2004 DUPONT "FINAL"



DUPONT
GARY HESS DESIGNS
PEPSI
Lays
The helmet design depicted on this page is the property of Gary Hess Designs, Inc. and may not be reproduced, painted or otherwise by any one other than Gary Hess Designs, Inc. without the expressed written permission or the purchase of the design copyright.
© 2004 2005 GARY HESS DESIGNS, INC. ALL RIGHTS RESERVED
DRIVER: JEFF GORDON
DESIGN #: 1
SPONSOR: DUPONT
DATE: 10-14-04

**2005 DUPONT POKER**
JEFF'S WINNING HAND FROM
CELEBRITY POKER TOURNAMENT
LATER CHANGED TO "ROYAL FLUSH"

 

 



2005 DUPONT ROYAL FLUSH
WITH "FLAME LICKS"



**2005 DUPONT ROYAL FLUSH**
**WITH NICORETTE LOGO**
**"CHANGED MID SEASON"**

**2006 DUPONT ROYAL FLUSH**
**WITH YELLOW NICORETTE LOGO**



rette
DUPONT
GARY HESS DESIGNS
PEPSI
orette
The helmet design depicted on this page is the property of Gary Hess Designs, Inc. and may not be reproduced, painted or otherwise by any one other than Gary Hess Designs, Inc. without the expressed written permission or the purchase of the design copyright.
© 2004-2005 GARY HESS DESIGNS, INC. ALL RIGHTS RESERVED
DRIVER: JEFF GORDON
DESIGN #: 1
SPONSOR: NICORETTE
DATE: 2-10-06
CUSTOM
GARY-HESS DESIGNS
PAINTING



2006 DUPONT/NICORETTE

**Exhibit B**

Jeff Gordon #24 Nascar 2002 Mini Helmet Tire Dated Collectible Ornament

US $14.99

TREVCO NASCAR JEFF GORDON #24 CAR WITH HELMET & ORNAMENT

US $10.00

   



2004 Nascar Jeff Gordon #24 Car Helmet Christmas Ornament

US $9.99

2004 Nascar Jeff Gordon #24 Car Helmet Christmas Ornament

US $9.99

2000 JEFF GORDON ORNAMENT Nascar Dupont Helmet MIB #24

US $5.99 +US $5.15 Shipping

Jeff Gordon #24 NASCAR Christmas Ornament x3 NEW Helmet Hood & Figure

US $9.99 +US $3.50 Shipping



Jeff Gordon #24 Radio/CD Player Rainbow Warrior/ Flame Dupont Helmet Full Scale5

US $90.00 +US $8.79 Shipping
Starting bid | 4d 18h

US $125.00 +US $8.79 Shipping
Buy It Now

Jeff Gordon No. 24 2003 DuPont 1:64 Scale NASCAR Radio Control with Helmet

(1)

US $15.24

RARE Jeff Gordon Lunchbox Flames Helmet Shaped NASCAR 2005 JG Motorsports

(0)

US $44.99 +US $7.40 Shipping

RARE Jeff Gordon Lunchbox Flames Helmet Shaped NASCAR 2005 JG Motorsports

(0)

US $44.99 +US $7.40 Shipping

**Jeff Gordon Signed Nascar DuPont Mini Helmet JSA**

$344.99

NASCAR - JEFF GORDON FIGURE & A CHOICE OF A RACING HELMET OR RACE CAR FAN PULLS

US $21.24



DUPONT NASCAR Helmet Bank

US $15.00 + US $10.00 Shipping
or Best Offer

Jeff Gordon Dupont Helmet Shaped Felt Pennant 16" X 15" New Free U.S. Shipping

US $9.99 FAST 'N FREE



Jeff Gordon 2005 DuPont Statue & Helmet Trevco Collectible Ornament

**US $5.24** + US $4.00 Shipping

Jeff Gordon 2003 Road Champs DuPont Flames Doll with Gloves and Helmet

(0)

**US $20.30** FAST 'N FREE

NASCAR - JEFF GORDON #24 - 6" Action Figure - with Trophy & Helmet - Road Champs

(0)

**US $10.99** FAST 'N FREE
or Best Offer

Retired Nascar Driver Jeff Gordon Holding Helmet Figure #2/1581By JG Motorsports

(0)

**US $11.50** + Free Shipping






24
JEFF GORDON
24

24
JEFF GORDON
24

NASCAR
24
24
Jeff Gordon

24
JEFF GORDON
24








24
PEPSI
GMAC

MINI REPLICA HELMET

24

24
DUPONT



**Description**

Cool NASCAR Jeff Gordon Fan Pack. Racing Collectibles for the Jeff Gordon fan or any NASCAR fan. There is 8 items total in this lot.

1 #24 Plastic License Plate
1 unopened 1/64th scale diecast car by Action
1 unopened Racing Yo-Yo (professional speed performance ball bearing)
1 plastic helmet pencil sharpener
1 vintage trackball computer mouse
1 Daytona Button

PEPSI
GARY HESS DESIGNS
Fritos

2002 Press Pass VIP - Head Gear #HG1 Jeff Gordon

2000 SP Authentic - Driver's Seat #DS8 Jeff Gordon

2006 Press Pass - Dominator Jeff Gordon #29 Jeff Gordon '95 Eye on the Prize

 

JEFF GORDON
Welding Helmet
24
HOBART
Stop And Read This!
Miller

NASCAR
Winston Cup Series
2001
SCHEDULE
DUPONT
JEFF GORDON

DUPONT
24
GOODYEAR
QUAKER STATE
GMAC